

FILED

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**MICHELE MBA,**<br><br>Defendant. | Case No: 23-cr-413 (ACR)<br><br>UNDER SEAL |

### STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the defendant, Michele N. Mba ("MBA"), and the United States agree and stipulate as follows:

### D.C. Medicaid and Behavioral Health Regulatory Framework

1. Medicaid was a health insurance program established by Congress under Title XIX of the Social Security Act of 1965. In the District of Columbia (D.C.), Medicaid was jointly funded by the federal and D.C. governments. Medicaid provided health insurance coverage to D.C. residents whose incomes were below a certain financial threshold. Recipients of medical services covered by Medicaid were referred to as "beneficiaries." Medicaid was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f). Under Medicaid, only medically necessary services were authorized to be reimbursed.

2. In Washington D.C., behavioral health services were administered by the D.C. Department of Behavioral Health ("DBH"). As the primary mental health authority in D.C., DBH was responsible for implementing and overseeing D.C.'s Mental Health Rehabilitative Services ("MHRS") program, a program covered by Medicaid. MHRS services were intended to assist

eligible beneficiaries navigate and alleviate the impact of mental and behavioral health issues. Beneficiaries who received MHRS were often referred to as "consumers."

3. Under the MHRS program, Medicaid covered and reimbursed standard behavioral health services, such as Community Support services. Community Support services included, among other things, assistance and support for mental-health consumers in stressor situations, individual mental health interventions, assistance with increasing social support skills to enable consumers to ameliorate life stresses, and the development of mental health relapse prevention strategies. Community Support services were provided by a consumer's Community Support Worker ("CSW") under the auspices of a certified Medicaid Provider known as a Core Services Agency ("Provider").

4. Medicaid also provided reimbursement for certain types of specialty MHRS services, including the Assertive Community Treatment ("ACT") program. The ACT program provided intensive, integrated services to adults with an "intractable, serious, and persistent mental illness with a diagnosis of either Axis I or Axis II from the DSM-IV." To assess candidates for inclusion in the ACT program, Providers were required to conduct a multi-axial diagnosis of the consumer's medical condition, a psychosocial summary, and a level of care utilization system ("LOCUS") assessment. Only consumers with a LOCUS score of 20-22 or higher during an initial assessment were eligible for ACT services. In order to exit or be "stepped down" from the ACT program, Providers were likewise required to conduct a LOCUS assessment to ensure the consumer no longer required the heightened level of care contemplated by the ACT program. Similarly, a consumer could not transfer to another Provider while receiving ACT services in order to ensure continuity of care for consumers with severe mental and behavioral health illnesses.

5.      In D.C., MHRS encounters with consumers were billed in "units," which were equivalent to 15 minutes of time providing services to a consumer. Standard MHRS encounters, including Community Support services, were assigned billing code H0036 and reimbursed by Medicaid at a rate of $97.08 per hour. ACT services were billed under code H0039 and reimbursed by Medicaid at a rate of $185.75 per hour. DBH regulations required the actual start and stop time of MHRS encounters to be used to calculate the duration of the service. For purposes of reimbursement, Medicaid authorized service encounters exceeding seven minutes to be rounded to the nearest whole unit.

6.      Because the ACT program was intended to provide intensive, wrap-around services to consumers with the most severe mental and behavioral health issues, Medicaid authorized Providers to submit reimbursable encounter notes more frequently for ACT consumers. Until November 2021, Medicaid authorized Providers to bill 200 units every 180 days for standard MHRS encounters. By contrast, Medicaid authorized Providers to bill 600 units every 180 days for ACT services. In November 2021, Medicaid increased the amount of units Providers were authorized to bill for MHRS encounters from 200 units to 600 units every 180 days.

7.      Providers were required to maintain up-to-date records and to accurately document all MHRS encounters billed under the Provider's electronic medical records ("EMR") system. In D.C., Providers typically used an EMR platform called Credible. In order to be reimbursed by Medicaid for MHRS services provided to consumers, CSWs were required to document the service in Credible by inputting clinical encounter notes that included, among other information, consumer information, treatment notes, and dates and times of service. CSWs were authorized to conduct MHRS encounters in several ways, including in the office or in-person. In response to the COVID pandemic, in or about March 2020, DBH authorized Providers to conduct MHRS encounters by

3

telehealth. A "tele" visit indicated a telephonic or virtual encounter with a consumer. CSWs were required to validate the accuracy and authenticy of the services by signing their names electronically in Credible. Once a CSW submitted an encounter note into Credible for reimbursement, Providers were required to review the notes for accuracy and approval prior to submission to Medicaid for reimbursement.

8. Providers, as well as all employees of Providers, including CSWs, were required to know, understand, and follow all federal and local laws, including Medicaid rules and regulations applicable in Washington D.C.

## Relevant Entities and Individuals

9. PRESTIGE HEALTHCARE RESOURCES ("PRESTIGE") was a Medicaid Provider headquartered at 1418 Good Hope Road SE in Washington D.C. At all relevant times, PRESTIGE was authorized to provide MHRS services to Medicaid beneficiaries in Washington D.C. On February 25, 2020, PRESTIGE was approved by DBH to implement an ACT Program.

10. AFFORDABLE HOME HEALTHCARE LLC ("AFFORDABLE") was a Medicaid Provider headquartered at 7826 Eastern Ave NW, Unit 411, Washington, D.C. At all relevant times, AFFORDABLE was authorized to provide MHRS services to Medicaid beneficiaries in Washington D.C. AFFORDABLE was not authorized by DBH to provide ACT services to consumers.

11. At all relevant times, CO-CONSPIRATOR 1 was a resident of Bowie, Maryland, and Fort Lauderdale, Florida. CO-CONSPIRATOR 1 became the CFO of PRESTIGE in 2019. In his role as CFO, CO-CONSPIRATOR 1 worked closely with MBA regarding billing for MHRS services and the implementation of the ACT Program. As part of his duties, CO-CONSPIRATOR 1 submitted, or caused to be submitted, claims to Medicaid for reimbursement.

4

12. At all relevant times, defendant MBA, a licensed Nurse Practitioner, was a resident of Baltimore, Maryland. In 2015, MBA was hired by PRESTIGE and, in or about February 2020, appointed to be the ACT Program Coordinator at PRESTIGE. As part of her duties, MBA submitted, or caused to be submitted, claims to Medicaid for reimbursement.

13. In the course of the conspiracy, CO-CONSPIRATOR 1 and MBA exercised oversight over multiple CSWs (the "the CSW Co-Conspirators").

14. In her role as a nurse practitioner, MBA submitted clinical encounter notes for services she allegedly performed on behalf of MHRS consumers. MBA also reviewed and approved encounter notes for MHRS services allegedly performed by CSWs working under her supervision. Once MBA approved the CSW notes in Credible, CO-CONSPIRATOR 1 batched the notes for submission to Medicaid for reimbursement.

15. In or about March 2020, MBA became the ACT Program Director at PRESTIGE. As the ACT Program Director, MBA worked closely with CO-CONSPIRATOR 1 to implement the ACT Program. In order for a consumer to receive ACT services, the Provider was required to certify that the required assessments had been completed, including LOCUS scores, and that a consumer met the criteria to be eligible for ACT services.

16. In or about April 2021, CO-CONSPIRATOR 1, MBA, and multiple CSWs transferred from PRESTIGE to AFFORDABLE. CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators worked at AFFORDABLE until approximately December 2022.

17. Consistent with the regulatory framework set forth above, and given their roles at PRESTIGE and later at AFFORDABLE, CO-CONSPIRATOR 1 and MBA were responsible for training the CSW Co-Conspirators on MHRS billing standards promulgated by Medicaid, as well as documentation of MHRS encounters required by Medicaid. By submitting encounter notes into

Credible and to Medicaid for reimbursement, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators were required to certify that the services were medically necessary and had been performed as documented in the encounter notes.

## Conspiracy to Commit Healthcare Fraud

18. From in or about January 2020 and continuing through in or about May 2021, in the District of Columbia and elsewhere, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators agreed and conspired to falsely certify that multiple MHRS consumers at PRESTIGE were eligible to receive ACT services when, in fact, the ACT services were not medically necessary. Specifically, CO-CONSPIRATOR 1 and MBA orchestrated a plan by which most, if not all, of the consumers on certain CSW Co-Conspirators' case loads were stepped up from receiving standard MHRS services into the ACT Program. CO-CONSPIRATOR 1 and MBA implemented the scheme by directing clinical personnel at PRESTIGE to submit false and fraudulent LOCUS scores. By stepping up these consumers with less severe mental and behavioral health issues into the ACT program, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators were able to bill Medicaid more frequently and at a significantly higher rate.

19. Once the consumers had been approved by DBH to receive ACT services, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators submitted encounter notes for ACT services that had been allegedly performed on behalf of these consumers. Despite knowing that the ACT program had been utilized primarily to increase revenue and knowing that the consumers had been approved for the ACT program on the basis of false and fraudulent assessments, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators billed Medicaid, or caused Medicaid to be billed, for ACT services that were not medically necessary. As explained further below, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators also billed Medicaid for standard MHRS

encounters, including ACT services, that were never provided or that falsely and fraudulently inflated the amount of time CSWs spent conducting MHRS encounters.

20.     In or about March 2021, following an employment dispute with PRESTIGE, CO-CONSPIRATOR 1 decided to terminate employment with PRESTIGE and transfer to another Provider, namely, AFFORDABLE. Because AFFORDABLE did not have an ACT Program, any consumers in PRESTIGE's ACT Program could not simply transfer to AFFORDABLE without the legally required medical assessments to determine whether any consumers continued to need ACT services. In furtherance of the conspiracy, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators initiated a plan to step down almost all of the ACT consumers from the ACT program in order to transfer those consumers to AFFORDABLE. CO-CONSPIRATOR 1 and MBA directed the CSW Co-Conspirators to initiate the ACT step-down process without regard to medical necessity. Similar to the mass step-up of these consumers into the ACT Program, CO-CONSPIRATOR 1 and MBA directed the CSW Co-Conspirators to falsify encounter notes to reflect that their consumers were stable and no longer in need of ACT services. In order to effectuate the transfers from PRESTIGE to AFFORDABLE, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators knowingly and willfully stepped consumers down from the ACT program without any medical necessity and solely so they could continue to submit bills to Medicaid for reimbursement.

21.     In addition to submitting false information to DBH regarding the ACT program, from in or about January 2020 and continuing through at least December 2022, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators knowingly submitted, or were willfully blind to the submission of, false and fraudulent MHRS clinical encounter notes to Medicaid for reimbursement. As explained in more detail below, CO-CONSPIRATOR 1, MBA, and the CSW

Co-Conspirators agreed and conspired to submit false and fraudulent MHRS encounter notes to Medicaid that (1) grossly inflated the amount of time spent conducting the service; (2) were based on services not authorized to be reimbursed by Medicaid; or (3) for MHRS encounters that did not occur.

22. As part of the conspiracy, CO-CONSPIRATOR 1 and MBA instructed and trained the CSW Co-Conspirators to submit, or were willfully blind to the submission of, telehealth encounter notes that grossly inflated the amount of time the CSW Co-Conspirators spent conducting services on behalf of a consumer. For example, CO-CONSPIRATOR 1 and MBA trained the CSW Co-Conspirators that MHRS encounters should be billed as if the service lasted an hour, even if the CSW had only engaged with a consumer for a few minutes or had only received a text message from a consumer.

23. In furtherance of the scheme, CO-CONSPIRATOR 1 and MBA instructed the CSW Co-Conspirators to utilize all 600 units for a consumer—the total amount of units authorized by Medicaid for a consumer during a 180-day period—without regard to medical necessity. As a result, MBA and the CSW Co-Conspirators submitted encounter notes that reflected an impossible amount of encounters with consumers. For example, MBA and the CSW Co-Conspirators regularly submitted hour-long telehealth encounters for 10, 12, or 14 hours per day for multiple weeks in a row. Notwithstanding that such billing patterns reflected an impossible amount of MHRS service encounters, CO-CONSPIRATOR 1 and MBA knowingly approved these encounter notes and submitted them to Medicaid for reimbursement without regard to whether the services had actually been performed.

24. Acting under the direction of and with the approval of CO-CONSPIRATOR 1 and MBA, the CSW Co-Conspirators submitted telehealth encounter notes for activities that were not

authorized to be reimbursed by Medicaid. CO-CONSIRATOR 1 and MBA trained the CSW Co-Conspirators to bill for "collateral services," which included time spent waiting for consumers, driving to meet with consumers, picking up prescriptions for consumers, or coordinating food deliveries for consumers.

25. CO-CONSPIRATOR 1 and MBA directed the CSW Co-Conspirators to submit, or were willfully blind to the submission of, encounter notes for services that never occurred. CO-CONSPIRATOR 1 and MBA coached the CSW Co-Conspirators on ways to write encounter notes, including by inputting false and fraudulent information about an encounter, so as to avoid scrutiny by DBH. CO-CONSPIRATOR 1 and MBA likewise encouraged, or were willfully blind to, the CSW Co-Conspirators' use of template or "cut and paste" notes.

26. CO-CONSPIRATOR 1 and MBA directed the CSW Co-Conspirators to submit false and fraudulent CSW encounter notes regarding MHRS authorizations and reauthorizations. With respect to authorizatioons, CO-CONSPIRATOR 1 and MBA trained the CSW Co-Conspirators to submit two notes based on the same encounter and to submit the second, fraudulent note days after the encounter actually occurred.

27. MBA and CO-CONSPIRATOR 1 ignored multiple instances of fraudulent encounter notes submitted by CSWs under their supervision, including false encounter notes submitted on behalf of deceased consumers or consumers who had not been seen by their CSW in months.

28. Despite knowing that Medicaid required that encounter notes contain truthful and accurate information about services provided and the amount of time spent conducting a service, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators knowingly and intentionally submitted such fraudulent encounter notes to Medicaid for reimbursement.

**MBA's Participation in the Conspiracy**

29.     At the time MBA became the ACT Program director at PRESTIGE, she learned that the ACT Program was being implemented to maximize revenue rather than medical necessity, as required by Medicaid, or to best meet the medical needs of consumers. Although MBA raised red flags regarding the mass step-ups of consumers into the ACT Program, her concerns were overruled by CO-CONSPIRATOR 1. Eventually, MBA agreed to include standard MHRS consumers into the ACT Program on the basis of falsified information. In order to execute the scheme, MBA directed clinical staff to "update" the LOCUS scores of consumers so that they met the requirements to receive ACT services. For example, in a January 2021 message, MBA told a CSW Co-Conspirator to send the "the list of all your clients," and to let clinical staff "know that all locus score[s] should be 22 and above." In another exchange, MBA emailed CO-CONSPIRATOR 1 with a list of consumers from a single CSW Co-Conspirator and explained that "the locus scores do not meet the criteria for ACT which is 22 and above." MBA told CO-CONSPIRATOR 1 that she would "find someone who can update these locus scores so that" she could complete the referrals. Notwithstanding that MBA knew that LOCUS assessments must be based in fact, and made on an individualized, case-by-case basis, MBA knowingly submitted ACT referrals to DBH on the basis of falsified LOCUS scores.

30.     When CO-CONSPIRATOR 1 decided to leave PRESTIGE over an employment dispute between him and the CEO, CO-CONSPIRATOR 1 sent a message to MBA directing her to step-down ACT consumers: "By Friday, I'll need you to step down the ACT clients for the CSW[s] that are coming with me." MBA responded that was "not a problem" because she had "been prepping the [CSWs] for this," which MBA clarified meant that "we can justify the step down base[d] on the fact that clients have been stable fo[r] a period greater than" six months. MBA

10

told CO-CONSPIRATOR 1 that she needed to "follow regulations on this one" and questioned whether so many step-downs at once would cause DBH to ask questions. Nevertheless, MBA agreed to implement the step down plan without conducting the required individualized assessments.

31. In furtherance of the step-down scheme, MBA created a WhatsApp chat thread called, "Let's Go," in which MBA, CO-CONSPIRATOR 1, and multiple CSW Co-Conspirators coordinated efforts to effectuate the fraudulent ACT step-down plan. MBA explained to the CSW Co-Conspirators: "From now moving forward, please make sure your documentation reflects your clients being stable and can justify the step down." Later in the same WhatsApp thread, MBA conceded that she "would have dropped the clients regardless because [she] was aware that most of the clients no longer met ACT criteria."

32. Between March 30, 2021 and April 2, 2021, MBA submitted requests to DBH to step-down approximately 193 consumers from the ACT Program. Although DBH halted the mass step-downs, MBA successfully submitted 94 encounter notes that falsely indicated that she had contacted consumers and confirmed the consumers no longer wished to received ACT services. Each of those 94 encounter notes contained exactly the same language, including the same typographical errors. In reality, as MBA knew, those 94 encounter notes were fabricated.

33. In addition to submitting fabricated notes regarding the ACT Program, MBA submitted fraudulent notes for standard MHRS encounters, as well. MBA concedes that she and the CSW Co-Conspirators had been instructed by CO-CONSPIRATOR 1 to "use those authorizations," which MBA interpreted to mean that she should utilize all 600 MHRS units authorized by Medicaid for each consumer every 180 days. In order to accomplish that goal, MBA submitted fraudulent notes for MHRS encounters that never occurred. For example, on September

13, 2021, MBA submitted notes for eleven hours of telehealth encounters for eleven different consumers. Each of the notes contained the exact same language, including the same typographical errors: "Consumer's reported that lack of knowledge has contributed to poor health choices and inability to improve overall health status. Though client reports no pain at this time, client indicates that there are moments of generalized body pain especially in joint that are believed to be brought upon by poor nutritional choices. Client showed interest in learning about making healthier lifestyle choices." The next day, September 14, MBA submitted ten hours of telehealth encounters that used the same cut-and-paste language for ten different consumers. None of these encounters occurred.

34.     MBA also trained CSW Co-Conspirators on ways to perpetuate the fraud, including by instructing CSWs on ways to write clinical encounter notes in order to avoid DBH scrutiny. In one message, MBA told a CSW that she could submit an encounter note for attempting to get a contact number for a consumer: "That's a billable. Lol." In another message exchange, a CSW Co-Conspirator questioned a note submitted by a different CSW Co-Conspirator for "inputting auths," which MBA understood meant submitting an encounter note for performing administrative tasks so that a CSW could continue to submit encounter notes for a consumer. According to the CSW Co-Conspirator, the other CSW was "finding ways to bill." Although MBA knew that submitting a CSW encounter note based on obtaining authorization to continue providing MHRS services was not reimbursable under Medicaid, MBA to responded, "Yep . . . Which is why I have been telling you to do the same."

35.     In various trainings, MBA also instructed the CSW Co-Conspirators on "little tricks and strategies" to use in order to "get more pay." For example, MBA trained the CSW Co-Conspirators to submit encounter notes in hour-long increments and told CSW Co-Conspirators to

"paste" notes but to "change it up so that nobody" could say the note had been simply copied and pasted. Likewise, in the section in Credible in which CSWs were required to document clinical encounters, MBA instructed the CSW Co-Conspirators to input "little bullsh*t" but to "make [the note]" consistent with the treatment plan.

## Loss Amount

36.     Based on the investigation to date and the government's analysis of relevant data to date, MBA's participation in the conspiracy resulted in a loss to Medicaid of over $1,500,000.

## Limited Basis of Factual Proffer

37.     This factual proffer is a limited summary of defendant MBA's conduct in connection with Count One of the Information to conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349, and is not intended to be a complete accounting of all facts and events that are known to the Government. The limited purpose of this Statement of Offense is to demonstrate that a factual basis exists to support the defendant's guilty plea in this case.

                Respectfully submitted,

                MATTHEW M. GRAVES
                United States Attorney

By: _____
                Christopher R. Howland (DC Bar 1016866)
                Assistant United States Attorney
                Fraud, Public Corruption, & Civil Rights Section
                601 D. Street, NW
                Washington, D.C.  20530
                (202) 252-7106
                Christopher.Howland@usdoj.gov

Date: November 20, 2023

## Defendant's Acceptance

I have read this Statement of the Offense and carefully reviewed every part of it with my attorneys.  I am fully satisfied with the legal services provided by my attorney in connection with

this Statement of the Offense and all matters relating to it. I fully understand this Statement of the Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

11-22-2023
Date

Michele N. Mba

### Defense Counsel's Acknowledgment

I am Michele Mba's attorney. I have reviewed every part of this Statement of the Offense with her. It accurately and completely sets forth the Statement of the Offense agreed to by the defendant and the Office of the United States Attorney for the District of Columbia.

11-22-2023
Date

John Sellers, Esquire
Attorney for Michele N. Mba